IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRITTANEY M. THOMAS, an Individual, | ) ) ) |
| Plaintiff, | ) ) Civil Action No.13-514 |
| vs. | ) ) Magistrate Judge Maureen P. Kelly ) |
| UNIVERSITY OF PITTSBURGH, AGNUS BERENATO, an individual, JANIA SIMS, an individual, PATTY COYLE, an individual, KHADIJA HEAD, an individual, MALLORIE WINN, and individual, and STEVE PEDERSON, an individual, | ) ) ) Re: ECF Nos. 34 & 36 ) ) ) ) ) |
| Defendants. | ) |

## OPINION

**KELLY, Magistrate Judge**

Plaintiff Brittany M. Thomas ("Plaintiff"), a former basketball player at the University of Pittsburgh, filed this civil rights and tort action against Defendant Jania Sims ("Sims"), and Defendants University of Pittsburgh ("the University"), Agnus Berenato ("Berenato"), Patty Coyle ("Coyle"), Khadija Head ("Head"), Mallorie Winn ("Winn"), and Steve Pederson ("Pederson") (collectively, "the University Defendants"). Plaintiff alleges claims for intentional discrimination on the basis of sex by the University and Pederson as well as claims for tortious conduct by the University, Berenato, Sims, Coyle, Head, and Winn, arising out of a locker room assault and Plaintiff's dismissal from the University's women's basketball team after the incident.

Before the Court are Motions to Dismiss certain claims set forth in Plaintiff's Second Amended Complaint filed on behalf of Defendant Sims, ECF No. 34, and the University Defendants, ECF No. 36. The Court has reviewed Plaintiff's Second Amended Complaint, ECF No. 30, Defendants' Motions to Dismiss, ECF Nos. 34 & 36, and accompanying Briefs in Support, ECF Nos. 35 & 37, as well as Plaintiff's Briefs in Opposition, ECF Nos. 39 & 41. Additionally, the Court has reviewed the University Defendants' Reply Brief, ECF No. 42. For the following reasons, Sims' Motion to Dismiss Plaintiff's punitive damages claims included in Counts I and II is denied; and the University Defendants' Motion to Dismiss Counts VIII, IX, X and XI is denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

When considering a motion to dismiss, the Court must accept as true the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011). Therefore, for the purposes of this decision, the essential facts are as follows.

Plaintiff alleges that in June 2008, she transferred from the University of Florida to the University of Pittsburgh, after signing a scholarship agreement. Pursuant to the agreement, the University granted her financial aid for tuition in exchange for her participation as a player on the women's basketball team. ECF No. 30 ¶ 9. As a transfer student, Plaintiff sat out the 2008-2009 basketball season, but played the following season, earning accolades for her scoring, overall play and character. Id. ¶¶ 10-13.

Plaintiff's claims arise from an incident that took place after a basketball game on December 1, 2010. Id. ¶ 14. In her Second Amended Complaint, Plaintiff alleges that on December 1, 2010, the team played an away game against St. Francis University. The team lost,

and immediately after the game, entered the locker room where Berenato, the head coach, began a team meeting. Id. ¶¶ 16-18. Berenato left to speak with the media, and Coyle continued the team meeting, which resulted in a conversation between Coyle and Plaintiff. Id. ¶¶ 20-22.

During the conversation, Plaintiff alleges that Sims "got up from her seat, crossed the locker room, and in front of and in close proximity to Coyle, Head, and Winn, approached Plaintiff in a threatening manner." Id. ¶¶ 23-24. Plaintiff alleges that Sims argued with Plaintiff, pushed her, and "sucker punched" Plaintiff with a closed fist on the left side of her face and lower jaw area, causing multiple lacerations and bleeding from Plaintiff's top and bottom lip. Plaintiff alleges that Coyle, Head, and Winn knew Sims had a violent propensity, but none of them made any effort to have her sit down or stay away from Plaintiff. Id. ¶ 25. Plaintiff claims she attempted to grab Sims to stop the assault, which caused both players to fall to the ground. Id. ¶ 26.

Berenato returned to the locker room, and Plaintiff told her what had transpired. Id. Berenato did not reprimand Sims. Id. ¶¶ 27-28. Plaintiff told Berenato that she was going to call her father regarding the incident. In response, Berenato grabbed Plaintiff's cellphone and told Plaintiff she was neither to call anyone nor go anywhere. Id. ¶ 29. Plaintiff attempted to leave the locker room to call her father, but in an effort to stop her, Berenato shoved her forearm into Plaintiff's throat, pushing Plaintiff into the lockers and causing Plaintiff to have difficulty breathing. Id. ¶¶ 30-32. Plaintiff alleges that Berenato kept Plaintiff isolated from the team while the rest of the team showered. Id. ¶¶ 34-36. Plaintiff noticed a text message from her mother on a second cell phone, but when she tried to respond, Head confiscated Plaintiff's second cellphone. Id. ¶ 37. After Plaintiff boarded the team bus, Berenato returned Plaintiff's cellphones. Id. ¶ 41

On December 2, 2010, Plaintiff was contacted by Berenato via text message to talk with the coaching staff. Id. ¶ 42. Plaintiff met with Berenato, Coyle, Head, and Winn, all of whom blamed Plaintiff for the incident between Plaintiff and Sims. The next day, Plaintiff had a second meeting with the coaching staff and Senior Associate Athletic Director Carol Sprague. During this meeting, Plaintiff was informed that she was indefinitely suspended from the team. Id. ¶¶ 42-44. Sims was also suspended from the team for her actions, but not indefinitely. Id. Plaintiff alleges her dismissal stands in stark contrast to the treatment of certain male athletes who, although criminally charged with assault or harassment, were permitted to remain at the University as student athletes with all associated benefits and privileges intact. Id. ¶¶ 45-50.

## II. STANDARD OF REVIEW

In assessing the sufficiency of the complaint pursuant to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must accept as true all material allegations in the complaint and all reasonable factual inferences must be viewed in the light most favorable to the plaintiff. Odd v. Malone, 538 F.3d 202, 205 (3d Cir. 2008). The court, however, need not accept bald assertions or inferences drawn by the plaintiff if they are unsupported by the facts set forth in the complaint. See California Public Employees' Retirement System v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004), citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Nor must the court accept legal conclusions set forth as factual allegations. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Rather, "factual allegations must be enough to raise a right to relief above the speculative level." Id., citing Papasan v. Allain, 478 U.S. 265, 286 (1986). Indeed, the United States Supreme Court has held that a complaint is properly dismissed under Fed. R. Civ. P. 12(b)(6) where it does not allege "enough facts to state a claim to relief that is plausible on its face," id. at 570, or where the factual content does not

allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). See Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (finding that, under Twombly, "labels and conclusions, and a formulaic recitation of the elements of a cause of action" do not suffice but, rather, the complaint "must allege facts suggestive of the proscribed conduct" and that are sufficient "'to raise a reasonable expectation that discovery will reveal evidence of" each necessary element of his claim).

The inquiry at the motion to dismiss stage is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," Twombly, 550 U.S. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 677. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

## III. DISCUSSION

### A. Punitive Damage Claims

Sims moves to dismiss Plaintiff's claims for punitive damages as set forth in Plaintiff's Second Amended Complaint at (Count I) assault and (Count II) battery. Under Pennsylvania law,

> punitive damages are an extreme remedy available in only the most exceptional matters. Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others. A defendant acts recklessly when his conduct creates an unreasonable risk of physical harm to another and such risk is substantially greater than that which is necessary to make his conduct negligent.

Seneca Ins. Co. v. Beale, No. 13-1737, 2014 WL 868928 (W.D. Pa. Mar. 5, 2014) (citations and quotations omitted). Therefore, "a showing of mere negligence, or even gross negligence, will not suffice to establish that punitive damages should be imposed. Rather, the plaintiff must adduce evidence which goes beyond a showing of negligence, evidence sufficient to establish that the defendant's acts amounted to intentional, willful, wanton or reckless conduct...." Id. See also Chambers v. Montgomery, 192 A.2d 355, 358 (Pa. 1963) (punitive damages not appropriate where there is no evidence that appellant intended to inflict bodily injury on appellee or that he hoped for such a result. "This is not to say that appellant is not liable for the damages resulting from the injury, but rather that the assault cannot be characterized as malicious, wanton, reckless or oppressive").

Plaintiff alleges that during the incident at issue, Sims walked across the locker room from where she had been sitting to approach Plaintiff, and pushed and "sucker punched" Plaintiff in the face with a closed fist. ECF No. 30 ¶ 24. Walking across the room to engage in a physical confrontation indicates "willful, wanton or reckless conduct" that exceeds "a showing of mere negligence, or even gross negligence…." Seneca Ins. Co. v. Beale, No. 13-1737, 2014 WL

868928 at *3. Plaintiff's allegations are sufficient to state a claim for punitive damages. See, also, Angelopoulos v. Lazarus PA Inc., 884 A.2d 255, 262 (Pa. Super. Ct. 2005) (evidence of record supported the trial court's submission of punitive damage claim to jury where Lazarus detained Angelopoulos in violation of the Retail Theft Act for an unreasonable period of time, in an unreasonable manner, and for a nefarious purpose).

Sims argues that the incident involved combat by mutual consent and therefore Plaintiff fails to state a claim for punitive damages. See Mawhinney v. Holtzhauer, 77 A.2d 734 (Pa. Super. Ct.1951). To the extent Defendant relies on Mawhinney, the Superior Court's holding makes clear that dismissal is inappropriate, whether on preliminary objections in state court or, as here, a motion to dismiss in federal court, when the underlying misconduct gives rise to a credibility contest. Id. at 735 ("conflicts as to who struck the first blow, and whether when defendant struck plaintiff on the nose he was the aggressor or was merely anticipating an attack by plaintiff, were questions of fact for the jury"). Plaintiff alleges that the only contact she directed at Sims involved a belated attempt to grab Sims to stop the assault, causing both players to fall the ground. ECF No. 30 ¶ 26. Accordingly, given the allegations set forth in Plaintiff's Second Amended Complaint, it is premature to dismiss Plaintiff's claims for punitive damages.[1]

### B. Section 1983 Claims

To state a claim arising under 42 U.S.C. §1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487

---

[1] Plaintiff also seeks punitive damages against the University and Berenato for assault (Count III), battery (Count IV), and intentional infliction of emotional distress (Count IV); and for false imprisonment (Count V) against the University, Berenato, and Head. However, the University Defendants have not substantively challenged Plaintiff's alleged entitlement to recover punitive damages; instead Defendants merely rely upon Sims' arguments regarding the viability of Plaintiff's punitive damage claims as to her. [ECF No. 37, p. 3]. Accordingly, at this stage of the litigation, and in the absence of any legal authority or argument to the contrary, Plaintiff's punitive damage claims against each of the remaining defendants may proceed as well.

7

U.S. 42, 48 (1988). In this case, Plaintiff alleges Section 1983 claims against Pederson and the University for the violation of her statutory rights under Title IX, 20 U.S.C. § 1681, and her right to equal protection under the Fourteenth Amendment to the United States Constitution.[2]

### 1. Equal Protection Claim (Count VIII)

The Fourteenth Amendment, in pertinent part, provides that "no State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).

Plaintiff has made an equal protection claim based on her membership in a protected class. To allege a protected-class equal protection claim, a plaintiff must allege that: (1) she is a member of a protected class; and (2) based on her gender she received different treatment than that received by other similarly situated individuals. Oliveira v. Township of Irvington, 41 F. App'x 555, 559 (3d Cir. 2002) (citing Keenan v. City of Philadelphia, 983 F.2d 459, 465 (3d Cir.1992)). Persons are similarly situated under the Equal Protection Clause when they are alike "in all relevant aspects." Startzell v. City of Philadelphia, 533 F.3d 183, 203 (3d Cir. 2008).

In addition, Plaintiff appears to allege a "class of one" equal protection claim. In Village of Willowbrook v. Olech, 528 U.S. 562 (2000), the United States Supreme Court outlined the "class of one" theory of equal protection. Under a "class of one" claim, a plaintiff asserts that she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id. at 564. "[T]o state a 'class of one' claim, a plaintiff must allege that '(1) the defendant treated him differently from others similarly situated,

---

[2] Gender discrimination covered by Title IX may "be pursued by way of a § 1983 suit by analyzing 'the substantive rights and protections guaranteed under Title IX and under the Equal Protection Clause.'" Hildebrand v. Allegheny Cnty., No. 13-1321, 2014 WL 2898527 * 6, ___ F.3d ___ (3d Cir. June 27, 2014)(quoting Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 256 (2009).

8

(2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment.'" Borrell v. Bloomsburg Univ., 955 F. Supp. 2d 390, 405 (M.D. Pa. 2013) (quoting Hill, 455 F.3d at 239).

The University and Pederson move to dismiss Plaintiff's equal protection claim, contending (i) Plaintiff has not alleged facts establishing disparate treatment based on gender because her comparators are not "sufficiently similar," and (ii) Pederson is entitled to qualified immunity, and if the claim against him fails, the University cannot be held independently liable. Plaintiff responds that the facts alleged clearly state a plausible Section 1983 equal protection claim and that Pederson's presumed knowledge of anti-discrimination laws renders untenable his claim for qualified immunity.

      **a.    Plaintiff has alleged disparate treatment based on gender.**

As to the first element of her claim, Plaintiff alleges that the University and Pederson treated her differently than others similarly situated with regard to the discipline imposed for the locker room incident, and that such selective treatment was predicated upon gender. Plaintiff identifies four specific instances where the University Athletic Department declined to suspend a male athlete after being criminally charged with assault or aggravated assault. ECF No. 30 ¶¶ 120-124. Additionally, Plaintiff identifies several other instances of lenient discipline of male athletes facing charges for harassment, disorderly conduct and drug possession. Plaintiff includes an example of a male basketball player who was not suspended after being charged with "aggravated assault and public drunkenness who allegedly disarmed a police officer." Id. ¶ 120. Plaintiff also alleges that Sims' suspension was harsher punishment that that meted out to male athletes who were not suspended after being charged with assault as support for the general proposition that women athletes are disciplined much harsher than male athletes. Id. ¶¶ 124-125.

9

The University and Pederson assert that Plaintiff has not alleged that Defendants treated similarly situated individuals differently, because Plaintiff's comparators consist of players with different coaches playing different sports. However,

> "[a]t the motion to dismiss stage, [the plaintiff] must allege facts sufficient to make plausible the existence of ... similarly situated parties." Perano v. Twp. of Tilden, 423 Fed. Appx. 234, 238 (3d Cir. 2011). While "'[p]ersons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects,'" Mun. Revenue Servs., Inc. v. McBlain, 347 Fed. Appx. 817, 825 (3d Cir. 2009) (quoting Startzell v. City of Phila., 533 F.3d 183, 203 (3d Cir. 2008)), "the law in the Third Circuit does not require [the plaintiff] to show that the [comparators] are identical in all relevant respects but only that they are alike." Southersby Dev. Corp. v. Borough of Jefferson Hills, 852 F. Supp.2d 616, 628 (W.D. Pa. 2012) (citing Startzell, 533 F.3d at 203); see also Simmermon v. Gabbianelli, 932 F. Supp.2d 626, 632–33 (D.N.J. 2013); Thomas v. Coopersmith, No. 11–7578, 2012 WL 3599415, at *5 (E.D. Pa. Aug. 21, 2012). "Determining whether an individual is 'similarly situated' to another individual is a case-by-case fact-intensive inquiry." Chan v. Cnty. of Lancaster, No. 10–3424, 2011 WL 4478283, at *15 (E.D. Pa. Sept. 26, 2011) (citing Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 305 (3d Cir. 2004)). "For that reason, some courts in this Circuit have stated that 'a final determination of this issue is inappropriate at the motion-to-dismiss stage.'" Thomas, 2012 WL 3599415, at *5 (quoting Chan, 2011 WL 4478283, at *15).

Borrell v. Bloomsburg Univ., 955 F. Supp. at 405.

The University Defendants' argument, taken at face value, would render implausible any gender based equal protection claim in an athletic setting, simply because, overwhelmingly, University athletes do not play on co-ed teams. Limiting comparators to players on the same team playing for the same coach overlooks the basic premise of Plaintiff's otherwise viable equal protection claim; that women athletes are treated substantially harsher than male athletes, regardless of whether they face identical charges or committed similar acts, simply and intentionally because they are women. The University Defendants' narrow construction of an equal protection claim is not tenable in the context of Plaintiff's claim. The alleged disparity in discipline based upon gender and exemplified by Plaintiff's identification of specific instances of

male athletes, who were subject to the same disciplinary policy, and who allegedly committed assaults, is sufficient to state an equal protection claim under 42 U.S.C. § 1983.

### b. Qualified Immunity

In the alternative, Pederson argues that the Motion to Dismiss should be granted in his favor because he is entitled to qualified immunity, and derivatively, the University argues that it cannot be independently liable if Pederson is immune.

> "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violated clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 815, 172 L.Ed. 2d 396 (1982)). There are two related but distinct inquiries in a qualified immunity case. One is whether the defendant's conduct violated the plaintiff's civil rights; the other is whether the right in question was clearly established at the time of the violation.

Schneyder v. Smith, 653 F.3d 313, 318 (3d Cir. 2011). Having already found that there is a potential question of fact concerning whether Defendant Pederson's actions violated Plaintiff's equal protection rights, the question becomes whether the particular right at issue was clearly established at the time.

"Ordinarily a constitutional duty is not clearly established simply because of the existence of a broad imperative like the one against "unreasonable . . . seizures," or equal protection. Id. at 329, quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987). Rather, to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id., quoting Anderson at 640. "The ultimate question . . . is whether the defendant had 'fair warning' that his conduct deprived his victim of a constitutional right.'" Id., quoting Hope v. Pelzer, 536 U.S. 730, 740 (2002).

Here, the wrongfulness of Pederson's actions appears to be self-evident under the long-standing constitutional and statutory protections afforded women athletes in and educational

setting. With regard to Plaintiff's constitutional rights, the Equal Protection Clause prohibits states from arbitrarily treating women differently from men. Reed v. Reed, 404 U.S. 71, 74 (1971); see also Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 273 (1979) (the Equal Protection Clause confers a federal constitutional right to be free from sex discrimination).

Apart from the constitutional prohibition against arbitrary treatment based upon gender, as more fully discussed *infra*, a statutory obligation also may be found under the Civil Rights Restoration Act of 1987, 20 U.S.C. § 1687 (1988), and pursuant to Title IX, 20 U.S.C. § 1681, prohibiting gender discrimination in educational athletics. As summarized by the United States Court of Appeals for the Third Circuit, the obligation of an educational institution in complying with the requirements of Title IX in interscholastic athletics turns on whether "disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes in the institution's program as a whole." Williams v. Sch. Dist. of Bethlehem, Pa., 998 F.2d 168, 176 (3d Cir. 1993). To the extent Plaintiff alleges a disparity in disciplinary treatment of male and female athletes, it must be determined whether Pederson violated clearly established statutory or constitutional rights of which a reasonable person in his position would have known.

Plaintiff alleges Pederson enforces discipline for violations of the University's Athletic Department's policies in a discriminatory manner, by implementing a policy of substantially harsher discipline for female student-athletes than that imposed upon similarly situated male student-athletes for similar violations of the Athletic Department's policies. ECF No. 30 ¶¶ 45, 47-48, 118-121, 124. Plaintiff also alleges that Pederson has been employed as the director of a large and competitive state university athletic department. Id. ¶45. Accordingly, Pederson should be cognizant of his statutory obligation not to implement different disciplinary

enforcement standards for male and female athletes. Disciplinary decisions affect a student athlete's ability to continue participation in a chosen sport, maintain scholarships, and complete an undergraduate education. Pederson knows or should know that discrimination based on gender in state university athletics, affecting each of these benefits, has been prohibited by law since 1972, or at the latest, 1988. At this stage of the litigation, it is apparent therefore that Defendant Pederson is not entitled to qualified immunity.

        2.    **Title IX Claim (Count IX)**

Plaintiff alleges a Title IX claim against the University regarding its intentional disparate disciplinary treatment of female student-athletes. Title IX provides that no person, on the basis of sex, shall "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The University Defendants move to dismiss this claim, because (a) the allegedly disparate treatment was not based on gender, and (b) Title IX does not provide a cause of action for athletic disciplinary action.

Title IX was meant to cover "a wide range of intentional unequal treatment, by using such a broad term, ["discrimination"], Congress gave the statute a broad reach." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167 (2005). In order to prove a prima facie case under Title IX, a plaintiff must show: "1) that she was excluded from participation in or denied the benefits of or subjected to discrimination in an educational program; 2) that the program receives federal assistance; and 3) that the exclusion was on the basis of sex, i.e., gender." Bougher v. Univ. of Pgh., 713 F. Supp. 139, 143-44 (W.D. Pa. 1989).

In determining whether Plaintiff has alleged sufficient facts to state a Title IX claim, both Plaintiff and the University agree that the University receives federal assistance. ECF No. 39,

13

p. 14. As to the remaining elements of her claim, Plaintiff alleges she was excluded from playing on the University's women's basketball team, and lost her eligibility to receive scholarship money, as a result disparate treatment based on gender. ECF No. 30 ¶ 137.

In making their argument that Plaintiff has failed to state a Title IX claim, the University Defendants ignore Title IX's implementing regulatory structure and the broad prohibition of discriminatory treatment in disciplinary matters for all educational programs or activities. See, 34 C.F.R. § 106.31(b)(4), which provides that an educational institution such as the University "in providing any aid, benefit, or service to a student, … shall not, on the basis of sex: . . .(4) Subject any person to separate or different rules of behavior, sanctions, or other treatment." Instead, the University Defendants rely exclusively on the examples of prohibited discriminatory treatment in athletics set forth in 34 C.F.R. § 106.41(c), and observe that discipline is not one of the protected categories. However, the University Defendants fail to point to any authority for the proposition that the anti-discrimination provisions in disciplinary matters set forth at 34 C.F.R. § 106.31(b)(4) do not apply to scholastic athletics.

In support of the required elements of her claim, Plaintiff provides specific examples of disparate treatment. Plaintiff identifies four specific instances where the University's Athletic Department declined to suspend a male athlete after being charged with assault and several other examples where male athletes were criminally charge for other offenses and yet not suspended. Id. ¶ 137. Plaintiff alleges that Sims also received harsher punishment by being suspended after the assault, when there are examples of male athletes who have not been suspended after committing similar acts. Id. Accordingly, Plaintiff alleges sufficient facts regarding the University's disparate treatment of females and males relating to disciplinary procedures to

sustain a Title IX claim. At this preliminary stage of the litigation, the Motion to Dismiss Plaintiff's Title IX claim is denied.

### C. Defamation (Count X) and False Light (Count XI).

Plaintiff alleges that the University and Berenato defamed her (Count X) and invaded her privacy (Count XI) by falsely stating to the Pittsburgh Post-Gazette and to the Pittsburgh Tribune Review that Plaintiff was suspended and dismissed from the basketball team for "violating team rules." ECF No. 30 ¶ 144. Plaintiff alleges that these statements were made without regard to falsity and with malice, to preserve Berenato's reputation and to cover up the fact that Plaintiff's departure, in fact, was related to Berenato and Sims' assaults, and the failure of the coaching staff to prevent Plaintiff's physical harm. The University Defendants contend that the statement at issue is not capable of defamatory meaning, and ultimately protected Plaintiff's reputation by failing to refer to the locker room assault. The University Defendants also posit that since Plaintiff has found employment as a player in Italy, she has suffered no harm from the allegedly defamatory statements.

#### 1. Defamation

To state a viable defamation claim under Pennsylvania law, Plaintiff must allege: (i) the defamatory character of the communication; (ii) its publication by the defendant; (iii) its application to the Plaintiff; (iv) the understanding by the recipient of its defamatory meaning; and (v) the understanding by the recipient of it as intended to be applied to the plaintiff. Tucker v. Fischbein, 237 F.3d 275, 281 (3d Cir. 2001), citing 42 Pa. Cons. Stat. Ann. § 8343(a) (1998).

"A publication is defamatory if it tends to blacken a person's reputation or expose him to public hatred, contempt or ridicule or injure him in his business or profession." Dunlap v. Phila. Newspapers, Inc., 448 A.2d 6, 10 (Pa. Super. Ct. 1982) (citation and internal quotation marks

15

omitted). "In order to be actionable, the words must be untrue, unjustifiable, and injurious to the reputation of another." Joseph v. Scranton Times L.P., 959 A.2d 322, 334 (Pa. Super. Ct. 2008). "When communications tend to lower a person in the estimation of the community, deter third persons from associating with him, or adversely affect his fitness for the proper conduct of his lawful business or profession, they are deemed defamatory." Id. (quoting Green v. Mizner, 692 A.2d 169, 172 (Pa. Super. Ct. 1997)). In addition, the United States Court of Appeals for the Third Circuit has noted that "[t]hough we are not aware of any Pennsylvania Supreme Court case on the point, inferior Pennsylvania courts applying Pennsylvania law have concluded that defamation may be established where a statement, viewed in context, creates a false implication." Graboff v. Colleran Firm, 744 F.3d at 136, citing Dunlap v. Phila. Newspapers, Inc., 448 A.2d at 15, and Mzamane v. Winfrey, 693 F.Supp.2d 442, 476–78 (E.D. Pa. 2010) (collecting cases approving a defamation-by-implication theory).

"'Procedurally, a trial court at the outset should decide whether a statement is capable of a defamatory meaning.' If the court determines that a statement can support such a meaning, the jury then must decide 'whether the recipient actually understood the statement to be defamatory.'" Graboff v. Colleran Firm, 744 F.3d 128, 135-36 (3d Cir. 2014) (internal citations omitted). The touchstone in determining whether a statement is capable of defamatory meaning is how the statement would be interpreted by the average person to whom it was directed. See Marier v. Lance, Inc., No. 07–4284, 2009 WL 297713, at *3 (3d Cir. Feb. 9, 2009) (internal citation omitted) ("In analyzing whether or not a statement is defamatory, Pennsylvania courts have held that "[t]he nature of the audience seeing or hearing the remarks is ... a critical factor in determining whether the communication is capable of a defamatory meaning").

16

In this case, a statement regarding Plaintiff's dismissal for failure to follow team rules, given the consequences at issue (loss of scholarship, membership on an NCAA Division I team), could reasonably be interpreted to mean that Plaintiff was not coachable or was so difficult to manage and violated team rules to such a degree, that dismissal from the team was the only alternative. Considering the intended audience for the statements, comprised of women's basketball teams, coaches and fans, this implication is capable of adversely affecting Plaintiff's reputation for fitness as a player for recruiting opportunities with scholastic or professional teams or as a potential employee in a non-athletic setting. The fact that Plaintiff eventually found employment as a player overseas does not detract from the potential damage done to her recruiting or draft status in the United States, if her preference was to remain in North America to play basketball.

In this regard, the statements are similar in nature to statements addressed in Mzamane, which were determined to present questions of fact for a jury as to the defamatory innuendo created. For example, statements such as "new employees were caring and dedicated" and that individuals "who remained at [a boarding school] were qualified to care for the girls could be understood by an average listener to infer the existence of undisclosed derogatory facts about Plaintiff's lack of such qualities." Mzamane v. Winfrey, 693 F. Supp. 2d at 494. At this stage of the litigation, the facts alleged by Plaintiff as to the damage done to her reputation by the allegedly false statements are sufficient to support a claim for defamation. See, also, Smith v. Wagner, 588 A.2d 1308, 1311 (Pa. Super. Ct .1991) (finding that depicting plaintiff as a liar is capable of defamatory meaning under Pennsylvania law).

## 2. False Light

In Graborr v. Colleran Firm, the United States Court of Appeals for the Third Circuit explained the contours of a false light claim in Pennsylvania law as follows:

> Pennsylvania has adopted the definition of false light invasion of privacy from the Restatement (Second) of Torts, which imposes liability on a person who publishes material that "is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity.…" Although to the best of our knowledge the Pennsylvania Supreme Court has not addressed the contours of falsity in the false-light-invasion-of-privacy context, the Superior Court has defined falsity broadly in that context. A plaintiff can establish falsity by showing that a defendant "selectively printed or broadcast true statements or pictures in a manner which created a false impression." Thus, even where a publication is literally true, "discrete presentation of information in a fashion which renders the publication susceptible to inferences casting one in a false light entitles the grievant to recompense for the wrong committed." The Superior Court has drawn this broad definition from defamation law, which permits recovery where a publication was true, but implied falsehoods.
>
> Applying this standard in Larsen [v. Phila. Newspapers, Inc., 543 A.2d 1181, 1199 (Pa. Super 1988)(en banc)], the Superior Court allowed the plaintiff's claim to survive a motion to dismiss where he alleged that a series of articles, although literally true, conveyed a false impression that he had lied under oath.

Graboff v. Colleran Firm, 744 F.3d at 136-37 (citations omitted).

The University Defendants contend that statements regarding Plaintiff's dismissal for "violating team rules" are not sufficiently offensive to state a claim for false light. Plaintiff counters that she was a "stellar athlete with impeccable credentials both on and off the field of play," and that to be subject to dismissal for an undisclosed "rules violation" "implies conduct by Plaintiff of the most horrendous nature." ECF No. 39, p. 20. At this stage of the litigation, accepting Plaintiff's allegations as true, the Court is inclined to agree with Plaintiff. The statements issued by the University and Berenato, in the context of the intended audience of fans, competing teams, and potential recruiters, and given the consequences to Plaintiff, including dismissal and the loss of a scholarship, are susceptible to inferences that Plaintiff committed a

grievous violation, on par with actionable inferences found in Byars v. School Dist. of Philadelphia, 942 F. Supp.2d 552, 567 (E.D. Pa. 2013) (that plaintiff was involved in the award of a contract later identified as a waste of public funds); Larsen, supra, (that plaintiff lied under oath), or Taha v. Bucks County, No. 12-6867, 2014 WL 1255211 (E.D. Pa. March 25, 2014) (that plaintiff was "BUSTED!" for a crime he did not commit). At this early juncture, Plaintiff has alleged a plausible claim for false light.

## IV. CONCLUSION

For the foregoing reasons, the Motions to Dismiss filed on behalf of Defendant Jania Sims, ECF No. 34, and on behalf of the University Defendants, ECF No. 36, are denied. An appropriate Order follows.

## ORDER

AND NOW, this 3rd day of July, 2014, upon consideration of the Motions to Dismiss filed on behalf of Defendant Jania Sims, ECF No. 34, and the Motion to Dismiss filed on behalf of the University of Pittsburgh, Agnus Berenato, Patty Coyle, Khadija-Head, Mallorie Winn, Carol Sprague and Steve Pederson, ECF No. 36, and the briefs filed in support and in opposition thereto, IT IS HEREBY ORDERED that the Motions to Dismiss are DENIED.

BY THE COURT,

/s/ Maureen P. Kelly
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

Dated: July 3, 2014

All counsel of record by Notice of Electronic Filing